# Exhibit G



# OFFICE OF THE PROSECUTOR
## COUNTY OF BURLINGTON
PO BOX 6000
MOUNT HOLLY, NEW JERSEY 08060
PHONE (609) 265-5035
www.burlpros.org



**ROBERT D. BERNARDI**
*BURLINGTON COUNTY PROSECUTOR*

**RAYMOND E. MILAVSKY**
*FIRST ASSISTANT PROSECUTOR*

**DARREN ANDERSON**
*CHIEF OF INVESTIGATIONS*

August 3, 2016

Honorable Terrence R. Cook, J.S.C.
Superior Court, Law Division
Burlington County Courts Facility
49 Rancocas Road
Mount Holly, New Jersey 08060

RE: <u>State v. Kevin Smith</u>
Indictment No. 2015-05-0523-I

State's Brief in Opposition to Defendant's Motion in Limine/Bar Evidence and Motion to Sever

Dear Judge Cook:

Please accept this letter brief in lieu of a more formal submission in response to Defendant's motion in limine and motion to sever. The State hereby opposes this motion and respectfully requests that it be denied.

APPELLATE UNIT
INFORMATION SYSTEMS UNIT
FAX (609) 265-5994

BURLINGTON COUNTY LAW ENFORCEMENT TRAINING CENTER
FAX (609) 726-7272

CHIEF OF INVESTIGATIONS
INSURANCE FRAUD UNIT
MAJOR CRIMES UNIT
PUBLIC INFORMATION OFFICER
VICTIM WITNESS UNIT
FAX (609) 265-5586

CHILD ADVOCACY CENTER (CAC)
FAX (609) 265-5906

COLLISION ANALYSIS AND RECONSTRUCTION (CAR)
FINANCIAL CRIMES UNIT
FORFEITURE / CIVIL REMEDIES UNIT
OFFICE ADMINISTRATION
TRIAL UNIT
FAX (609) 265-5007

CRIME SCENE / EVIDENCE MANAGEMENT UNITS
FAX (609) 265-3729

GANG, GUN, NARCOTICS TASK FORCE(GGNTF)
FAX (609) 265-5390

GRAND JURY/CASE SCREENING UNIT
FAMILY UNIT
FAX (609) 265-3154

HIGH TECH CRIMES UNIT
FAX (609) 267-6569

MEGAN'S LAW
FAX (609) 265-5769

SEXUAL ASSAULT AND CHILD ABUSE UNIT (SACA)
FAX (609) 265-5160

SPECIAL INVESTIGATIONS UNIT
FAX (609) 265-5145

1

## STATEMENT OF FACTS

On September 11, 2013, Thomas A. Wallace ("Wallace"), Sheron Y. Wilson ("Wilson"), and Tatiana N. Johnson ("Johnson") arrived at 31 Larkin Road, Burlington, New Jersey. [Pa3]. Wallace entered his house to do laundry while Johnson and Wilson remained in the car. [Pa3]. When Wallace returned from the house and was outside, three black males wearing matching blue tee shirts approached the property. [Pa3]. One of the black males was tall with dreadlocks that were wrapped up in a Rastafarian style hair wrap. [Pa3]. The other two black males had short hair, one with facial hair and one clean shaven. [Pa3]. As Wallace was exiting the house, the three suspects approached him. [Pa4]. One of the suspects then asked Wallace for a glass of water. [Pa7].

Wallace opened the front door and pushed the door closed but it was not secured. [Pa7]. Two of the suspects followed him into the home towards the kitchen where one of the suspects pulled out a handgun. [Pa7]. The suspect with the dreadlocks remained outside on the front lawn. [Pa4]. The two suspects inside then forced Wallace to the floor in the kitchen and tied him up with cords. [Pa7]. Wallace was then assaulted and taken to the bathroom on the second floor. [Pa7]. The suspects then demanded money or cocaine. [Pa7]. Wallace had $700.00 in his

2

pockets and one of the suspects reached into his pocket and took it. [Pa7]. Wallace then advised the suspects that there was no money in the house and that it was at the apartment he stayed at in Edgewater Park, New Jersey. [Pa7].

While Wallace was inside with the two suspects, Johnson attempted to call Wallace several times, but his phone went straight to voicemail. [Pa4]. The suspect outside with the dreadlocks then approached the car with Johnson and Wilson and advised that Wallace wanted his girlfriend, Johnson, inside. [Pa4]. Johnson then entered the home through the front door with the suspect walking behind her. [Pa4]. Johnson walked up the stairs to the living room area where she turned the corner towards the second floor and was confronted by one of the suspects pointing a handgun at her. [Pa4]. She was then escorted by the suspect with dreadlocks into a bedroom on the second floor. [Pa4]. Johnson was asked several times where the money was and then ordered to the ground where she was tied up with wires and cable cords. [Pa4].

The suspects then brought Wilson into the bedroom with Johnson and tied her up, too. [Pa4]. The suspects then continued asking Wallace where the money and drugs were. [Pa4]. One of the suspects then walked over to Johnson and kicked her. [Pa4]. Johnson advised that the suspect with the dreadlocks was

using a cell phone and she could overhear a female's voice on the other end of the phone. [Pa4]. Wallace then informed the suspects that there were surveillance cameras throughout the house. [Pa4]. The suspects then took Wallace to the basement and tied him up, where they continued to assault him. [Pa7].

The suspect with the dreadlocks continued to enter the bedroom that Johnson and Wilson were being kept. [Pa4]. The suspect with the dreadlocks then reached into Johnson's pants and penetrated her digitally. [Pa4-5]. The two other suspects walked upstairs and told him that Johnson was Wallace's girlfriend. [Pa5]. The suspect with the dreadlocks then pulled his hand out of her pants and got on top of Wilson. [Pa5]. The suspect with the dreadlocks then lifted Wilson up off the floor and began to sexually assault Wilson. [Pa5]. Johnson did not observe the sexual assault but heard Wilson performing oral sex on the suspect with the dreadlocks. [Pa5]. Johnson advised that the suspect with the dreadlocks said several times that he was "getting entertainment" and told Wilson to swallow. [Pa5]. The suspect then tied Wilson's legs. [Pa5].

Johnson remained in the bedroom and heard the suspects in the house. [Pa5]. Moments later it was silent and Johnson was able to free herself. [Pa5]. Johnson then untied Wilson and walked down into the basement, while Wilson exited the front

4

door. [Pa5]. Johnson found Wallace tied up in the back room area to a pole, naked and bloody. [Pa5]. Johnson freed Wallace from the tape and cords, exited the house, and went to 33 Larkin Road to contact the homeowner for assistance. [Pa5].

Johnson and Wilson had both left their cell phones in Wallace's vehicle, but when she exited the house after the incident the cell phones were missing, along with a black backpack belonging to Wallace. [Pa5]. Wilson's wallet was also taken from the vehicle. [Pa5]. All of the victims claim to have not known any of the three suspects. [Pa5,7].

On July 23, 2014, New Jersey State Police sent a letter advising that they received a CODIS DNA profile from a Poland Spring water bottle that was located in the home of 31 Larkin Road and the profile belonged to Michael Robinson ("Robinson"). [Pa12]. Detective Shawn Gorlin found Robinson's Facebook page, which had his cell phone listed as (347) 617-7492. [Pa12]. On July 29, 2014, Detective Gorlin applied for a Communications Data Warrant to retrieve and record telephone numbers called to and from Robinson's phone number. [Pa13].

On August 1, 2014, Detective Gorlin informed Detective Ent that the phone number (607) 343-8574 was the most frequently called number on Robinson's phone records. [Pa13]. A search of that phone number showed the phone number belonging to Adriane

5

Williams ("Williams"). [Pa13]. On August 6, 2014, Detective Ent prepared a CDW for the phone records for Williams' phone. [Pa14]. The records and GPS coordinates show that her cell phone was in the area of 31 Larkin Road, Burlington, New Jersey on September 11, 2013 during the time of the crimes. [Pa14]. One of the telephone numbers called by both Williams and Robinson on September 11, 2013 during the time of the crimes was (917) 370-3914, which belongs to Kevin Smith ("Smith"). [Pa14].

Detective Gorlin was able to locate Smith's Facebook page, which depicted him as a black male with dreadlocks, matching the description provided by both Johnson and Wilson. [Pa14]. On August 13, 2014, Burlington County Superior Court Judge Claypoole granted the request for a CDW for Smith's cell phone cell sites and records. [Pa14]. On September 2, 2014, Detective Gorlin confirmed that the records and GPS coordinates show that Smith's cell phone was in the area of 31 Larkin Road on September 11, 2013 during the time of the crimes. [Pa15]. There were telephone calls made to and from Williams' telephone during the time of the crime. [Pa15].

On September 5, 2014, Detective Ent and Detective Denelsbeck conducted an interview of Williams. [Pa16]. In summary, Williams advised that she and Robinson had driven to Brooklyn on September 11, 2013. [Pa17]. In Brooklyn, they

6

picked up Smith and an unidentified suspect. [Pa17]. Williams then drove Robinson, Smith and the third black male to the Burlington area in New Jersey. [Pa17].

Williams parked in front of 31 Larkin Road and the three male suspects exited the vehicle wearing matching "Team Spitzer" tee shirts. [Pa17]. Moments later Wallace, Wilson and Johnson pulled up and parked in front of Williams' vehicle. [Pa17]. Williams advised that the three suspects entered the home with the three victims and remained inside for about an hour. [Pa17]. When the three suspects exited the house, they went to the victim's car before entering Williams' vehicle and driving away. [Pa17]. Williams proceeded to then drive back to Brooklyn to drop Smith and the unidentified suspect off before returning to Binghamton with Robinson. [Pa17].

## PROCEDURAL HISTORY

On May 5, 2015, the Burlington County Grand Jury returned an eleven count Indictment, number 2015-05-0523-I, charging Defendant and Michael Robinson to three counts of first degree kidnapping contrary to N.J.S. 2C:13-1, one count of first degree armed robbery contrary to N.J.S. 2C:15-1, one count of second degree burglary contrary to N.J.S. 2C:18-2a(1), one count of second degree aggravated assault contrary to N.J.S. 2C:12-1b(1), one count of second degree possession of a weapon (firearm) for

7

an unlawful purpose contrary to N.J.S. 2C:39-4a(1), one count of second degree unlawful possession of a weapon (firearm) contrary to N.J.S. 2C:39-5b(1), and one count of second degree possession of a weapon by a convicted felon/certain persons contrary to N.J.S. 2C:39-7b(1). Only Smith was charged with two counts of first degree aggravated sexual assault contrary to N.J.S. 2C:14-2a(3).

## LEGAL ARGUMENT

### Point I

<u>The State Did Not Willfully Withhold Evidence of Defendant's Cell Phone Records and Has Since Provided the Cell Phone Records Upon Request by the Defendant.</u>

The State submits that there was no Brady violation, as the evidence was provided as soon as defense counsel requested it and it was not willfully withheld from defense counsel. <u>Rule</u> 3:13-3(g) states that if a party has failed to comply with the discovery rule, the court "may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." A number of factors must be considered in deciding how this Rule is to be implemented:

8

(1) Whether the State's position was arguably correct; (2) whether the information sought through discovery was material to the defense; and (3) the nature of the offense, whether it was so serious that the interest of the public would be unacceptably abused by a severe sanction.

State v. Polasky, 216 N.J. Super. 549, 556 (Law Div. 1986). The nature of the offense in this case is very serious and the interest of the public would be jeopardized by a severe sanction.

The court in State v. Marshall, 123 N.J. 1 (1991) examined whether the State disclosed correspondence to the defense and, if it was not, whether the non-disclosure was willful and if the information was improperly withheld from the defense. Id. at 171-72. The court determined that the burden of proof was on the State to prove that the failure to disclose the documents had not been willful. Id. at 172. Here, the State received a request from defense counsel for the cell phone records. Upon receiving the request, the State realized they did not have the cell phone records, either. The State then acquired the cell phone records for their own file and provided them to the defendant as soon as they received them. No one had asked for

9

the cell phone records prior to this interaction. The non-disclosure was not willful or intentional.

It would be drastic and harsh to suppress the cell phone records in this case. Such a drastic remedy should not be invoked in advance of trial except upon the plainest and clearest grounds, which is not the case here. <u>State v. Polito</u>, 146 <u>N.J. Super.</u> 552, 557 (App. Div. 1977).

The State would respectfully submit that the defendant's motion to suppress the cell phone information be denied.

### Point II

### The State Should Not Be Required to Present Its Evidence about Cell Phone Records through Expert Report and Testimony Because the Subject Matter is Not Beyond the Ken of the Average Juror.

The State submits that evidence relating to geographic location of a cell phone user based upon cell phone call logs does not require expert testimony to be introduced to the fact-finder. Defense counsel properly points out the three basic requirements for the admission of expert testimony:

"(1) The intended testimony must concern a subject matter that is beyond the ken of the average juror;

(2) the field testified to must be at a state of the art such that an expert's testimony could be

10

sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." State v. Kelly, 97 N.J. 178, 208 (1984).

The cell phone records in this case are not a subject matter that is beyond the ken of the average juror. The cell phone records consist of a call log that list the date and time of a phone call, the phone number the call was conducted with, and the longitude and latitude of where the call occurred. Detectives can then run the locations and determine where the defendant was when the phone call occurred. It does not require a scientific, technical, or specialized knowledge to understand the process used in this case.

The defendant cites State v. Earls, 214 N.J. 564 (2013) to illustrate the potential complexities in explaining GPS and cell phone tracking information to the fact-finders. In Earls there was live GPS tracking of the defendant's cell phone conducted by T-Mobile when police requested without a warrant. In the case at hand, the police received the defendant's cell phone call log through a CDW and simply plugged in the listed locations to determine if any of the calls on the day of the crime were in the area the crime was committed. There was no live GPS tracking of the defendant. Earls also states that there were 326.4 million cell phones in use in the United States in 2012.

11

Id. at 579. As of May 2013, 91 percent of American adults have a cell phone. Id. These statistics further the argument that a cell phone call log is not beyond the ken of the average juror in modern day, as the vast majority of American adults have and use cell phones on a daily basis.

The State submits that expert testimony is not required to explain the cell phone records and call log in this case as they are not beyond the knowledge of the average juror. Therefore, the State submits the request to require an expert report and testimony should be denied.

## Point III

## Defendant Must Have a Substantially Exculpatory Statement From Robinson in Order to Prove Prejudice and Have His Trial Severed.

Joinder of two or more defendants in the same indictment is permitted pursuant to Rule 3:7-7 if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. There are some circumstances that require a joint trial to be severed. The court in State v. Sanchez, 143 N.J. 273 (1996) stated that the trial court should sever a joint trial if the court is reasonably certain that: (1) the defendant will call his codefendant as a witness in a separate trial; (2)

the codefendant, who is unwilling to testify at a joint trial, will testify at a separate trial either prior or after his own trial; and (3) the codefendant's proffered testimony will be credible and substantially exculpatory. Id. at 293. A severance motion should not be granted on the basis of a mere possibility that the codefendant will testify in a separate trial. Id. at 294. In assessing whether the proffered testimony will be substantially exculpatory, the court must evaluate the proposed testimony in the context of the apparent weight of the State's case, while keeping in mind the credibility of the testimony would be subject to impeachment. Id. at 294-95.

The defendant here contends that his joinder with codefendant Robinson for trial will abridge his right to a fair trial because it is alleged that Robinson could provide exculpatory testimony for defendant if called as a witness by defendant Smith. However, as stated in Sanchez, a severance motion should not be granted on the basis of a mere possibility that the codefendant will testify in a separate trial. There must be something more concrete that can assure Robinson will testify in a separate trial. In addition, the defendant has not provided an explanation on how Robinson's proffered testimony would be substantially exculpatory, especially when evaluated in the context of the weight of the State's case.

Robinson has not guaranteed or provided any reassurance that he will provide exculpatory testimony. In addition, there is not proof that any testimony Robinson would provide would prove to be substantially exculpatory. Robinson also has a criminal history that would be used to impeach the credibility of his testimony. Therefore, the State submits the motion to sever should be denied.

## CONCLUSION

For the above reasons and authorities cited in support thereof, the State respectfully requests that this Court deny Defendant's motion.

Respectfully Submitted,

ROBERT D. BERNARDI
BURLINGTON COUNTY PROSECUTOR

Stephen Eife
Assistant County Prosecutor